**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **CRIMINAL NO. 98-CR-30022-NJR** |
| | ) | |
| **DEANDRE LEWIS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S EMERGENCY
MOTION FOR SENTENCE REDUCTION**

The defendant, DeAndre Lewis, filed an emergency *pro se* motion to reduce his sentence. (Docs. 954, 956). The defendant is pursuing such relief under the "compassionate release" provisions of 18 U.S.C. § 3582(c)(1)(A) in light of the current COVID-19 pandemic. This Court should deny the defendant's motion because he is not substantively entitled to discretionary compassionate release under 18 U.S.C. § 3582.

**I. BACKGROUND**

The defendant was convicted in February 2001 for offenses relating to the murder of Debra Abeln. *See generally United States v. Westmoreland,* 312 F.3d 302 (7th Cir. 2002). The defendant initially received a life-sentence, which the Court later reduced to 450 months. *See* ECF 903. On August 3, 2020, the defendant filed a Motion for Compassionate Release, which he supplemented on August 20, 2020. *See* ECF docs. 954, 956. On October 22, 2020, this Court granted the Federal Public Defender's motion to withdraw from this case. The Court also ordered the government to respond to the *pro se* motion. The defendant is currently housed at FCI-Terre Haute, with an anticipated release date of May 10, 2032. https://www.bop.gov/inmateloc.

### A. The Debra Abeln Murder and Subsequent Investigation and Trials

The defendant pled guilty in February 2001 for offenses relating to the murder of Debra Abeln. *See generally Westmoreland,* 312 F.3d 302. The defendant was the hired gunman in that offense. Debra Abeln was the mother of three children, ranging in age from 12 to 19. She was also the caretaker of her elderly parents.

On December 27, 1997, Debra traveled with her twelve-year-old son Travis and her husband, Richard Abeln, from their home in St. Louis, Missouri, to CRT Aviation, their airplane maintenance business in Sauget, Illinois. TT, vol. II, pp. 158-59, vol. VII, pp. 145-46.[1] Besides the aircraft business, the Abelns also owned Jeffco Trucking Company in St. Louis, Missouri, a multi-million dollar interstate trucking outfit. TT, vol. II, pp. 101-102. Richard and Debra had built the business from nothing during the 70s and 80s. *Id.* The Abelns traveled to CRT Aviation in Sauget, Illinois, ostensibly so Richard Abeln could install a spare part in his private airplane. TT, vol. II, p. 159, vol. VII, p. 44.

At approximately 6:00 p.m., the Abelns walked out of the business and got into their sports utility vehicle which was parked on the lot just outside the business. *Id.* Travis Abeln sat in the backseat behind his parents. TT, vol. VII, p. 48. A masked gunman, later identified as the defendant, suddenly ran up to the vehicle. TT, vol. II, p. 159, vol. VII, p. 49. He wore a ski mask and dark clothing and was carrying a sawed-off shotgun. TT, vol. II, pp. 159-60, vol. VII, p. 49. The defendant ran directly to the passenger side of the automobile, where Debra Abeln was seated. TT, vol. II, p. 160. Debra saw him coming, and she yelled for her husband to lock the doors. TT, vol. II, p. 159, vol. VII, p. 48. Richard did not lock the doors. *Id.* The defendant opened her door and demanded Debra's jewelry. TT, vol. II, p. 160, vol. VII, p. 49. Debra complied with that demand. TT, vol. VII, p. 50.

---

[1] The trial transcript in this case consists of 18 volumes that bear Roman numerals. The trial transcript will be designated throughout this response as "TT, vol.___, p.____."

After the defendant took the jewelry and cash, employees of CRT Aviation walked out of the business and onto the parking lot. TT, vol. II, p. 160, vol. VII, p. 50. The defendant then jumped into the backseat of the vehicle next to twelve year-old Travis Abeln. TT, vol. VII, p. 50. Travis wondered if he was about to die. *Id.* The defendant hid in the backseat next to Travis until the employees left the area. TT, vol. II, p. 160, vol. VII, p. 52. After the parking lot was clear, the defendant got out of the backseat and ordered Richard Abeln to get out of the vehicle. TT, vol. VII, p. 53. Richard walked around to the front of the car. *Id.* The defendant then told Debra Abeln to get out of the vehicle. TT, vol. VII, p. 53. Despite having a sawed-off shotgun pointed at her head, Debra refused to leave the vehicle with Travis still inside. TT, vol. VII, pp. 53-54. Travis scurried out of the vehicle so that his mother would comply with the gunman's demands. TT, vol. VII, p.54. Richard Abeln told Travis to get back inside the vehicle, which he did. TT, vol. VII, pp. 54-55. Debra began to struggle with the defendant, continually expressing her concern for Travis's safety. *Id.* The defendant then fired two near point-blank shots from the double-barreled sawed-off shotgun into Debra Abeln's chest while she was partially out of the car. TT, vol. VII, p. 55. The blast severed Debra Abeln's aorta, caused massive internal damage, and killed her. TT, vol. II, p. 13, vol. VIII, p. 15-20. The defendant fled the scene in a dark blue Dodge pick-up truck. TT, vol. II, p. 165, vol. III, p. 10.

From the moment they arrived on the scene, the authorities were immediately suspicious of the facts surrounding the shooting. TT, vol. VII, pp. 175-77. The whole scenario made no sense. *Id.* CRT Aviation was located at a remote regional airport in Sauget, Illinois. TT, vol. VII, p. 176. Sauget has nearby businesses–notably bars and notorious strip joints–whose parking lots contain more inviting targets for armed robbers. *Id.* In addition, the shooter jumped into the vehicle *after* receiving his bounty. TT, vol. VII, p. 50. It would have made more sense for him to flee after the CRT Aviation employees walked out onto the lot if robbery were truly his motive. In addition, the shooter used both of his shots on the

3

petite and defenseless Debra while Richard's hulking presence stood mere feet away. TT, vol. VII, pp. 175-77. Accordingly, the officers investigating the case immediately turned their attention to Richard Abeln. TT, vol. VII, pp. 175-77.

Their subsequent investigation revealed that Richard Abeln had been having extra-marital affairs with at least three women and that he might be engaged in drug dealing activities. TT, vol. III, pp. 119-21, vol. IV, pp. 3-5. On January 5, 1998, Abeln met with homicide agents with the Illinois State Police. TT, vol. III, p. 20. Those agents included Martin "Marty" Milkovich who was the lead homicide agent for the state police. The agents asked Abeln to submit to a polygraph examination and Abeln agreed. TT, vol. II, p. 21. The officers had pre-arranged to have a polygraph examiner on site to conduct the examination. Abeln failed the polygraph examination. TT, vol. III, pp. 21-22. He then confessed to being involved in Debra Abeln's murder. TT, vol. III, p. 22. He also implicated two other individuals in the murder. Those individuals were Guy Westmoreland and defendant Deandre Lewis. *Id.*

Guy Westmoreland and Richard Abeln became friends and business associates in the early 1990s. TT, vol. II, pp. 103. Westmoreland managed his family's Phillips 66 service station, just down the block from Abeln's trucking company. TT, vol. II, pp. 102. Abeln's trucking company had a running account at the station. TT, vol. II, pp. 103. Westmoreland would also pester Abeln from time to time to join him in various legitimate business ventures and get-rich-quick schemes. TT, vol. II, pp. 103-05, 106-07.

In late 1996 or early 1997, Guy Westmoreland approached Richard Abeln with a more sinister business proposition. TT, vol. II, pp. 107–08. Westmoreland told Abeln that if he put up half the purchase price for a kilogram of cocaine, or $8,000, and provided his airplane and hangar at CRT Aviation, Westmoreland would distribute the cocaine and double Abeln's money. TT, vol. II, pp. 108-110, 114-15. Westmoreland further told Abeln that he had a contact for cocaine who lived in southern Texas. TT, vol. II, pp. 108, 116-16. Abeln readily agreed to engage in drug trafficking with Westmoreland. TT, vol. II,

p. 115. Thereafter, Westmoreland, with Abeln's airplane and financial support, arranged for the transportation of multi-kilogram shipments of cocaine and marihuana from southern Texas to the Southern District of Illinois. TT, vol. II, p.123.

Initially, Abeln, who had recently obtained his basic private pilot's license, made the flights with Westmoreland as a passenger. TT, vol. II, pp. 118-23. Later, after a particularly harrowing drug flight into two south Texas thunderstorms, where they almost ran out of fuel and died, Abeln and Westmoreland agreed to hire Abeln's flight instructor and employee, Stephen Anthony Jestis, to make the flights. TT, vol. II, pp. 126-31, vol. V, pp. 69-70. Westmoreland and Abeln accompanied Jestis on at least one flight, and Westmoreland accompanied him on at least one additional flight. TT, vol. II, pp. 131-32. Later, Jestis made solo flights to obtain the drugs. TT, vol. II, p. 132, vol. V, pp. 75-83. The drugs were always obtained in South Texas from co-defendant Ronnie Gene Gray, and then flown back to CRT Aviation in Sauget, Illinois. TT, vol. II, pp. 132-34. Ronnie Gene Gray's primary supplier for cocaine was Ricardo "Ricky" Guerra. TT, vol. V, pp. 133-56. Guerra also supplied Gray with marihuana. TT, vol. V, pp. 142, 144. Gray also had drug suppliers besides Guerra. TT, vol. V, pp. 162-63. After receiving the drugs from Gray, Westmoreland distributed the drugs and shared some of the profits with Abeln. TT, vol. II, p. 117.

During the nine or ten month period preceding Debra Abeln's murder, Westmoreland and Abeln acquired seven kilograms of cocaine and approximately two hundred pounds of marihuana from Guerra through Gray. TT, vol. V, pp. 158, 213-214, vol. VI, pp. 42-43. Abeln knew Gray supplied some marihuana to Westmoreland who told Abeln he brought it back as a favor to Gray. TT, vol. II, p. 117. Actually, Westmoreland purchased several hundred pounds of marihuana from Gray and had it transported in Abeln's plane, without Abeln's knowledge. TT, vol. V, pp. 161-63.

In the meantime, by summer 1997, Richard Abeln had grown tired of his marriage to Debra. TT, vol. II, p. 138. Abeln began complaining to Westmoreland about Debra Abeln and his desire to get out of

5

his marriage. TT, vol. II, pp. 139-40. He lodged those complaints to Westmoreland because he wanted Westmoreland to offer to kill Debra. *Id*. Westmoreland often boasted to Richard Abeln, and others, that he could arrange murders. TT, vol. II, pp. 138-39, vol. VII, pp. 86-89. Abeln did not want to divorce Debra Abeln because of the cost of a divorce and because of the prospect of giving her half of his assets. TT, vol. II, pp. 139-40. At first, Westmoreland declined to get involved in murdering Debra Abeln. TT, vol. II, p. 140. Eventually, however, Westmoreland changed his mind. *Id*. He went to Richard Abeln and told him that he would "take care" of Richard's problem. *Id*. He made this commitment after Richard Abeln told him that Debra had learned of their drug trafficking activities and was threatening to tell the police. TT, vol. II, p. 145. Debra Abeln had not, in fact, discovered the drug enterprise–Richard Abeln told Westmoreland she had in order to secure Westmoreland's commitment to murder her. *Id*. After Richard and Westmoreland agreed to murder Debra, they began in earnest to plan her killing. TT, vol. II, p. 140. Westmoreland suggested several scenarios: a drive-by shooting, a sniper shooting at Jeffco, and a hit-and-run accident. TT, vol. II, pp. 140-41, 146.

Eventually, Westmoreland decided they should murder Debra at CRT Aviation and make it look like a robbery gone bad. TT, vol. II, p. 142. Westmoreland told Richard Abeln that defendant Deandre Lewis, one of Westmoreland's service station employees, would do the actual shooting. TT, vol. II, pp. 143-44, vol. IV, p. 35. Abeln was shocked that Westmoreland would choose the defendant to commit the murder because the defendant was so small and did not look like a "hitman." TT, vol. II, p. 144. Westmoreland assured Abeln, however, that the defendant was an ideal choice to take care of their problem. TT, vol. II, p. 144. Westmoreland and Abeln agreed the defendant would be paid five thousand dollars for committing the murder. TT, vol. II, p. 146. The money was to come from Abeln's share of their cocaine profits. *Id*. By late November, Westmoreland secured the defendant's firm agreement to commit the murder. TT, vol. X, p. 143.

6

The defendant testified that he first met Guy Westmoreland in the summer of 1997 through one of his cousins who worked for Westmoreland. TT, vol. X, pp. 122-23. Westmoreland later hired the defendant to work at the service station in October 1997. TT, vol. X, p. 127. At the time, the defendant was on probation and living in a halfway house. TT, vol. X, pp. 123-26. In November of 1997, Westmoreland approached the defendant and said a woman was interfering with his drug business and he "needed them missing." TT, vol. X, p. 135. Westmoreland told the defendant the woman was "threatening to tell the police" about Westmoreland and Abeln's drug business. TT, vol. X, p. 136. Westmoreland wanted the defendant to handle the problem for him. *Id.* The defendant understood that Westmoreland wanted the woman killed. TT, vol. X, p. 138. At first, the defendant declined because he was not sure Westmoreland was serious. TT, vol. X, pp. 136-37. When Westmoreland continued to solicit the defendant's help, however, the defendant realized Westmoreland was serious and he agreed to commit the murder for ten thousand dollars. TT, vol. X, p. 137. Westmoreland accepted the offer. TT, vol. X, pp. 137-38. Later Westmoreland agreed to sweeten the pot with some cocaine. TT, vol. X, p.139. Thereafter, Westmoreland and the defendant discussed several scenarios for committing the murder. TT, vol. X, p. 140-43. Eventually, Westmoreland presented the idea of the defendant committing the murder at the airport in Sauget, Illinois. TT, vol. X, pp. 140, 142-43. Westmoreland told the defendant that the airport would be the perfect place because it was out of state, very dark and had little traffic. TT, vol. X, pp. 142-43.

The first attempt on Debra Abeln's life occurred on December 17, 1997. TT, vol. II, pp. 147-52.[2] Richard and Westmoreland agreed that Richard would concoct a ruse to lure Debra to CRT Aviation and Westmoreland would kill her while she was there. *Id.* On that day, Richard arranged to have Debra Abeln pick him up when he arrived from Chicago in his private airplane. TT, vol. II, pp. 148-49, vol. VII, pp.

---

[2]According to the defendant, he was not involved in this initial attempt on Debra's life. TT, vol. X, pp. 143-44.

89-91. Westmoreland later explained to Abeln that he was unable to kill Debra that day and that he had shattered the back windshield of Debra's mini-van. TT, vol. II, p. 151, vol. III, pp. 2-3. Westmoreland told Abeln that he had laid in wait for Debra Abeln in the parking lot, but she walked into the terminal so fast, he was unable to kill her. *Id.* Westmoreland said he shattered the back window in Debra Abeln's mini-van to lure her back to the parking lot, but she did not return and survived that attempt on her life. TT, vol. II, p. 151. She would not survive the next one.

In the days following the failed attempt on Debra Abeln's life, Westmoreland, the defendant, and Richard Abeln conferred, and Westmoreland decided that the murder should occur while the Westmoreland family took a Disney cruise from Florida during the 1997 Christmas holiday. TT, vol. II, pp. 152-55, vol. X, pp. 145-45. Before leaving on his Christmas cruise, Westmoreland directed Richard Abeln to establish the exact time of the murder with the defendant. TT, vol. II, p. 155.

Westmoreland and the defendant had already agreed the murder should occur on December 27, 1997, when Westmoreland had an alibi and when the defendant had a furlough from the halfway house. TT, vol. X, p. 146. Westmoreland also told the defendant to use a customer's dark blue Dodge truck, that was at Westmoreland's service station for repair, as the murder vehicle. TT, vol. V, pp. 148-49. The defendant and Westmoreland also discussed the murder weapon. TT, vol. X, p. 149. The defendant told Westmoreland he planned to use a sawed-off shotgun, to which Westmoreland responded, "[T]hat's perfect, that'll do." *Id.* Westmoreland also provided the defendant with a Nextel cellular telephone and told him Abeln would contact him concerning the murder on that phone. TT, vol. X, p. 148. Finally, Westmoreland instructed the defendant that, after the murder, the defendant should hold on to any stolen items and keep quiet. TT, vol. X, p. 152. On December 22, 1997, Westmoreland left with his family on his Christmas holiday and left Richard Abeln and the defendant to iron out the remaining details of Debra's impending murder. TT, vol. X, pp. 147-48.

Despite being two thousand miles away and paying nearly sixteen thousand dollars for his family's first ever vacation, Westmoreland seemed drawn to the unfolding events of the impending murder. TT, vol. VIII, pp. 79-86, 90-91. During the 10 days he was away on vacation, Westmoreland and Richard Abeln attempted to contact each other 39 times. TT, vol. XII, pp. 108-09.

On December 26 and 27, 1997, Richard Abeln, as directed by Westmoreland, made the final arrangements with the defendant to have his wife murdered. TT, vol. II, pp. 157-58. He and the defendant decided that Richard should arrive at CRT Aviation with Debra Abeln sometime around 6:00 p.m., and the defendant would kill her before they left. *Id.* On Saturday, December 27, 1997, at approximately 5:30 p.m., Abeln began the trek to CRT Aviation with Debra and Travis. TT, vol. II, p. 158. At approximately the same time, the defendant left his house for the airport. TT, vol. X, p. 155. At approximately 6:00 p.m., as arranged, and as previously described, the defendant murdered Debra Abeln with two sawed-off shotgun blasts to the chest. *See supra* pp. 4-5. He fled from the murder scene in the dark blue Dodge pick-up truck that Westmoreland had told him to use. TT, vol. II, p. 165, vol. III, p. 10. As he fled, he threw the sawed-off shotgun out the window over a railroad overpass. TT, vol. X, pp. 167-68.[3]

On December 31, 1997, Guy Westmoreland returned with his family from his Christmas cruise. TT, vol. XII, pp. 107-08. On the morning after his return, he went to the defendant's residence and rousted him out of bed. TT, vol. XI, pp. 40-41. He told the defendant to deliver the blue Dodge getaway truck to him on the next day because Westmoreland wanted to "get rid of it." TT, vol. XI, p. 42. He asked the defendant if he had disposed of the murder weapon. The defendant assured him he had. TT, vol. XI, p. 43. He then asked the defendant to give him the jewelry he had taken from Debra Abeln. *Id.* After the defendant gave him the jewelry, Westmoreland and the defendant drove down to the Mississippi River

---

[3] Law enforcement agents found the gun more than three years later after The defendant told them where he had thrown it. TT, vol. XII, pp. 15-26.

9

and threw the jewelry in the river. TT, vol. XI, pp. 43-44. The following day, as directed, the defendant delivered the blue Dodge truck to Westmoreland. TT, vol. XI, p. 45. Westmoreland then had it secreted at a salvage yard in St. Louis County, Missouri. TT, vol. VIII, pp. 108-09.

On January 5, 1998, the police focus on Richard Abeln proved justified. On that day, Richard Abeln traveled with his oldest son for a pre-arranged interview with the Illinois State Police. TT, vol. III, p. 20. His oldest son, Ryan Abeln, drove him to the meeting. TT, vol. VII, p. 96. Richard Abeln was nervous about the meeting and, on the way, stopped to consult with Westmoreland. TT, vol. III, pp. 20, 150-51. They discussed the meeting and the potential that Richard would be asked to take a polygraph examination. TT, vol. III, pp. 20-21. Westmoreland advised Abeln to "pop some valiums" in case the police asked him to submit to a polygraph. TT, vol. III, p. 21. Abeln heeded that advice and traveled to the meeting. *Id.*

After arriving at Illinois State Police headquarters in Collinsville, Illinois, officers escorted Richard Abeln into an interview room, and Ryan Abeln remained in the lobby. TT, vol. VII, p. 94. While he waited, Ryan received numerous pages and phone calls from Guy Westmoreland who wanted to know "how things were going." TT, vol. VII, pp. 99-106. Whenever Ryan did not immediately answer one of his pages, Westmoreland got upset. TT, vol. VIII, p. 110.

During the interview of Richard, officers confronted him with their doubts about him. TT, vol. III, pp. 156-58, vol. X, p. 102. One of the officers confronting Abeln was lead case agent Martin "Marty" Milkovich. *Id.* Richard took the fateful polygraph examination, and despite the Westmoreland prescribed valium, he dismally failed. TT, vol. III, pp. 21-22. After flunking the lie detector test, Richard confessed to Milkovich that he had been involved in his wife's murder. TT, vol. III, p. 22. He also told the police his accomplices were "Guy" and "Deandre." TT, vol. III, p. 23.

After his confession to being involved in the murder of Debra Abeln, Richard Abeln made a series of early morning recorded telephone calls to Guy Westmoreland. TT, vol. III, p. 23. Abeln first reached Westmoreland at home, but Westmoreland was worried that his telephone was wiretapped so he left his home and drove through dense fog in his underwear to a pay telephone to continue the conversations. TT, vol. VIII, p. 97, 125. *See also Trial Exhibits* 24 and 24(a*)*, Recorded Conversations and Transcript. Abeln and Westmoreland discussed the murder and their drug distribution activities. *Id.* Particularly, Westmoreland assured Abeln that the defendant would not talk and that the police had not recovered Debra Abeln's stolen jewelry. TT, vol. III, p. 31. *See also Trial Exhibits* 24 and 24(a), Recorded Telephone Conversations and Transcripts. He also insisted on meeting Abeln face-to-face.

To accommodate Westmoreland's request for a face-to-face meeting, police arranged for Richard Abeln to get a hotel room, and established surveillance in it, and in an adjoining room, with the purpose of Westmoreland coming to the hotel. TT, vol. X, pp. 70-71, 97-99. When Westmoreland learned that Abeln was at the hotel, he left his home, got into a truck belonging to a service station customer parked outside his home, and drove once again through dense fog to the hotel. It was approximately 5:00 a.m. TT, vol. X, p. 96. He proceeded to Abeln's room where he insisted that Abeln leave the hotel with him. TT, vol. X, p. 72. Police then arrested Westmoreland. *Id.* In a post-arrest statement, Westmoreland admitted being involved in drug dealing with Abeln, but denied all knowledge of "a murder for hire." TT, vol. X, p. 100. Significantly, no one up to that point had mentioned anything about a "murder for hire" to Westmoreland. *Id.*

After his arrest, Westmoreland directed the destruction of evidence from his jail cell. He ordered his wife and his sister to remove drugs from a pinball machine at Westmoreland's house. TT, vol. VIII, pp. 135–139. The two also destroyed cocaine-packaging material and wiped down a desk to remove traces of cocaine residue. *Id.* Westmoreland also ordered his wife to arrange for the destruction of the blue

Dodge truck-the murder vehicle. TT, vol. VIII, pp. 140-41, 143-44. She followed his orders and had the truck destroyed at a St. Louis auto-salvage yard. *Id.*

Guy Westmoreland was subsequently indicted for drug trafficking. A jury convicted him of that crime in August 1998. After Westmoreland's conviction for drug trafficking, a grand jury in the Southern District of Illinois indicted the defendant, Westmoreland, and Richard Abeln in May 1999, for murder and conspiracy to murder Debra Abeln. The murder indictment was made possible by the guilty pleas and cooperation of some of the defendant's co-conspirators, most notably Richard Abeln.

After the murder indictments, Guy Westmoreland's wife and drug coconspirator, Bronnie Westmoreland, agreed to cooperate with the government. TT, vol. VIII, pp. 152-155. The government granted her immunity and she began cooperating in October 1999. TT, vol. VIII, p. 154. After she agreed to cooperate, the government relocated her on an emergency basis, established a covert identity for her, and paid her living expenses. TT. Vol. VIII, pp.155-158. The government took these precautions out of fear that Guy Westmoreland or his family would have her killed. Shortly after her relocation, in November of 1999, Bronnie Westmoreland began a sexual affair with Martin Milkovich. Vol. VIII, pp. 162-170. As previously noted, Milkovich was the lead case agent for the Illinois State Police on the murder investigation. Bronnie Westmoreland and Milkovich carried on their affair for several months until April of 2000. TT, vol. VIII, p. 166-167. In May 2000, the Drug Enforcement Administration received an anonymous tip that Bronnie Westmoreland was having an affair with an officer assigned to the case. Doc. 577. A subsequent investigation uncovered the Bronnie Westmoreland/Marty Milkovich affair. The United States Attorney's Office notified the Department of Justice, the Court, and defense counsel of the affair. It thereafter became a significant issue in the case. Because of the affair, then Attorney General Janet Reno directed Southern District of Illinois prosecutors to forgo the death penalty against all the murder coconspirators, including the defendant. (Doc. 577).

**B. Trial, Sentencings and Aftermath.**

Guy Westmoreland was eventually tried for the murder of Debra Abeln in June 2001. After most of his drug co-conspirators and all of his murder co-conspirators testified against him, a jury convicted Westmoreland for his role in the murder of Debra Abeln. He is now serving a life sentence. Richard Abeln pled guilty, testified against Westmoreland and received a life sentence. The life sentence was meaningless to Abeln. He always maintained to friends, family, defense attorneys, agents, and prosecutors, that, once in prison, he would find a way to kill himself as penance for his role in the murder of Debra. Richard committed suicide in prison on December 29, 2002, near the 5-year anniversary of Debra's murder. www.findagrave.com/memorial/107633231/richard-charles-abeln. The defendant pled guilty to life imprisonment and testified against Westmoreland. In order to secure the defendant's cooperation against the ringleaders of the murder plot—Guy Westmoreland and Richard Abeln—the government agreed to consider recommending a reduction in sentence, and ultimately did. Accordingly, the defendant, who is now 43 years old, is serving the remaining 11.5 years of the 450-month sentence the District Court imposed. The defendant now seeks compassionate release from that sentence and asks that this Court place him on home confinement.

## II. ARGUMENT

The defendant argues that he is entitled to release pursuant to the compassionate release provisions at 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act of 2018. The defendant primarily argues that the general existence of COVID-19 in the prison population entitles him to relief. He also alleges that his underlying health conditions of "asthma, stomach ulcers. . .and . . .two hernia surgeries" render him particularly vulnerable to COVID-19. ECF 954 at 1. This Court should deny the defendant's motion.

### A. The Relevant Statutory Scheme.

The defendant asserts that the statutory scheme set forth at 18 U.S.C. § 3582(c), as amended by the First Step Act of 2018, affords him an avenue whereby the Court can now reduce his sentence to time-served or home confinement. *Id.* Section 3582(c) now provides in pertinent part:

**(c) Modification of an imposed term of imprisonment.**--The court may not modify a term of imprisonment once it has been imposed except that—

**(1)** in any case--

**(A)** the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

**(i)** extraordinary and compelling reasons warrant such a reduction; or

**(ii)** the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C.A. § 3582.

The defendant implicitly argues in his *pro se* motion that he is entitled to the relief he requests under the "extraordinary and compelling reasons" component of the above statute. That aspect of the statute requires any reduction granted under it to be "consistent with applicable policy statements issued by the Sentencing Commission." *Id.* The Sentencing Commission had already promulgated such a policy statement prior to the First Step Act Amendment to § 3582(c). That policy statement is set forth at

U.S.S.G. § 1B1.13 and it became effective November 1, 2006, and was subsequently amended in 2007, 2010, 2016, and 2018. That Guideline section and its relevant commentary provides:

> **§ 1B1.13. Reduction in Term of Imprisonment Under 18 U.S.C. § 3582(c)(1)(A) (Policy Statement)**
>
> Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that—
>
> **(1)(A)** Extraordinary and compelling reasons warrant the reduction; or
>
> **(B)** The defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which the defendant is imprisoned;
>
> **(2)** The defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and
>
> **(3)** The reduction is consistent with this policy statement.
>
> **COMMENTARY**
>
> **Application Notes:**
>
> **1. Extraordinary and Compelling Reasons.--**Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> **(A) Medical Condition of the Defendant.—**
>
> **(i)** The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
> **(ii)** The defendant is—
>
> **(I)** suffering from a serious physical or medical condition,
> **(II)** suffering from a serious functional or cognitive impairment, or>
> **(III)** experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-

care within the environment of a correctional facility and from which he or she is not expected to recover.

**(B) Age of the Defendant.--**The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

**(C) Family Circumstances.—**

**(i)** The death or incapacitation of the caregiver of the defendant's minor child or minor children.

**(ii)** The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

**(D) Other Reasons.--**As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

U.S.S.G. 1B1.13

Following the enactment of the First Step Act, courts have split on whether USSG § 1B1.13 and its application notes still govern the "extraordinary and compelling" reason determination. Some courts have held § 1B1.13 no longer applies to motions for compassionate release brought to district court by defendants. *See e.g., United States v. Rodriguez,* 424 F.Supp.3d 674, 682 (N.D. Cal. 2019); *United States v Haynes*, 2020 WL 1941478 (E.D.N.Y. Apr. 22, 2020) (citing 13 such cases); *United States v. Brown,* 411 F.Supp.3d 446, 449-450 (S.D. Iowa, Oct. 8, 2019); *United States v. Cantu*, 423 F. Supp. 3d 345, 352 (S.D. Tex. June 17, 2019); *United States v. Fox*, 2019 WL 3046086, *3 (D. Me. July 11, 2019) ("the Commission's existing policy statement provides helpful guidance on the factors that support compassionate release, although it is not ultimately conclusive"). In so ruling, certain courts have stated that the policy statement is inapplicable because it does not interpret the current version of the statute. *See Cantu*, 423 F.Supp. 3d at 350. Others have concluded the Director is no longer the only party able to determine other extraordinary and compelling reasons under § 1B1.13, based on the fact that

16

the Director is no longer the only party capable of bringing such motions. *See e.g. United States v. Redd*, 2020 WL 1248493, at *7 (E.D. Va. Mar. 16, 2020).

More convincingly, however, multiple courts have held that the definition of "extraordinary and compelling reasons" under § 1B1.13 remains binding because the First Step Act did not affect Congress's directive that the Commission - not the courts - is to provide the relevant criteria. *See, e.g.*, *United States v. Saldana*, 807 F.App'x 816, 819 (10th Cir. 2020) (rejecting compassionate release claim based on post-sentencing rehabilitation because "neither the § 1B1.13 commentary nor BOP Program Statement 5050.50 identify post-sentencing developments in case law as an 'extraordinary and compelling reason' warranting a sentence reduction"); *United States v. Rollins*, 2020 WL 3077593, at *2 (N.D. Ill. June 10, 2020) (rejecting claim that stacked § 924(c) sentences resulting in 106-year sentence and the FSA's changes to the law could warrant compassionate release because "§ 3582(c)(1)(A)(i) does not grant the court the authority to reduce Rollins's sentence on this ground"); *see also United States v. Strain*, 2020 WL 1977114, at *4 (D. Alaska Apr. 24, 2020); *United States v. Plowright*, 2020 WL 3316989, at *2 (S.D. Ga. June 18, 2020); *United States v. Goldberg*, 2020 WL 1853298, at *4 (D.D.C. Apr. 13, 2020); *United States v. Childs*, 2019 WL 6771781, at *2 (D. Kan. Dec. 12, 2019). The government respectfully submits this Court should follow these latter authorities but the resolution of this issue does not affect the defendant's request for compassionate release because regardless of the standard this Court applies in its determination of whether "extraordinary and compelling circumstances" exist, the defendant cannot make the requisite showing.

      **B.**    **The defendant is Not Suffering from A Medical Condition that Entitles him to Compassionate Release.**

The defendant alleges that his underlying health conditions of "asthma, stomach ulcers. . .and . . two hernia surgeries" render him particularly vulnerable to COVID-19. ECF 954 at 1. None of these conditions are ones which the Center for Disease Control has identified as placing an individual at

increased risk of severe illness from the virus that causes COVID-19. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html. Furthermore, the defendant's BOP medical records do not reflect that he suffers from asthma or stomach ulcers. *See* Attachment 1—Deandre Lewis BOP Medical Records at 001-037. For COVID-19 purposes, the most pertinent allegation that the defendant makes is concerning his purported asthma. As noted, however, not only do the defendant's records not indicate that he is being treated for asthma, they also indicate the defendant has denied in the past that he suffers from asthma. *See Id.* at 021. Essentially then, the defendant can only invoke the mere fact of the COVID-19 pandemic as grounds for his compassionate release. COVID-19 alone does not, however, provide a basis for compassionate release. *See United States v. Alexander*, 2020 WL 6161401, at *2 (C.D. Ill. Oct. 21, 2020). If the mere presence of COVID-19 justified compassionate release, every inmate could be released. *See, e.g. United States v. Melgarejo*, 2020 WL 2395982, at *5 (C.D. Ill. May 12, 2020); *see also United States v. Riley*, 2020 WL 1819838, at *7 (W.D. Wash. Apr. 10, 2020) (the "extraordinary and compelling" circumstances warranting release under Section 3582(c)(1) are not satisfied by "the mere elevated risk of contracting a pandemic virus in prison, even if such a higher risk exists."); *United States v. Wright*, 2020 WL 1976828, at *5 (W.D. La. Apr. 24, 2020) ("The Court stresses that the rampant spread of the coronavirus and the conditions of confinement in jail, alone, are not sufficient grounds to justify a finding of extraordinary and compelling circumstances). Obviously, this Court cannot release every prisoner at risk of contracting COVID-19 because the Court would then be obligated to release every prisoner. *Wright*, 2020 WL 1976828, at *5. The COVID-19 pandemic alone does not create extraordinary and compelling circumstances warranting the defendant's release. Therefore, this Court should deny his motion.

### C. Even if The defendant Suffered from Qualifying Medical Conditions under the Relevant Guidelines, This Court Should deny his Release Because he is Dangerous and Because of the Section 3553(a) Sentencing Factors.

Even if the defendant qualified for compassionate release under the relevant substantive law, this Court should nevertheless deny his motion. The defendant is a danger to the community and the 3553(a) sentencing factors require his continued incarceration.

#### 1. The defendant remains a danger to the community

This Court may not reduce a defendant's sentence unless it finds that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." USSG § 1B1.13. The record in this case precludes such a finding. The defendant committed a gruesome and depraved murder of a mother of three in front of her youngest 12-year-old child for nothing other than drugs and money, while on a one-day furlough from a halfway house where he was serving parole. The circumstances of the murder, and the defendant's involvement in it, could not be more unsettling. *See supra* Section A.

Nothing about the COVID-19 pandemic reduces the defendant's danger to others. He remains a danger to the safety of other persons and to the community, and this Court should not release him.

#### 2. Section 3553(a) Sentencing Factors

As part of its analysis regarding whether "extraordinary and compelling reasons," exist for compassionate release, a court must also consider the factors set forth in section 3553(a). 18 U.S.C. § 3582(c)(1)(A). *United States v. Ebbers*, 2020 WL 91399, at *6 (S.D.N.Y. Jan. 8, 2020). Section 3553(a) instructs sentencing judges to consider: (1) offense and offender characteristics; (2) the need for a sentence to reflect the basic aims of sentencing, namely, (a) "just punishment" (retribution), (b) deterrence, (c) incapacitation, (d) rehabilitation; (3) the sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid

unwarranted disparities; and (7) the need for restitution. A sentencing judge should also "impose a sentence sufficient, but not greater than necessary, to comply with" the basic aims of sentencing." *Rita v. United States*, 551 U.S. 338, 347–483 (2007);  18 U.S.C. § 3553(a).

In light of the 3553(a) sentencing factors, this Court should deny the defendant's motion for compassionate release even if it somehow concludes that his medical conditions make him eligible for such relief.  The defendant committed a murder that was heinous and depraved. He killed an innocent mother of three in a gruesome and violent manner while her youngest son watched in horror.  The defendant sat right next to that sobbing and shaking 12 year old, knowing that he was seconds from executing his mother.  Debra's murder also affected more than just Travis and her other two sons.  She was a beloved daughter to her parents and a friend to hundreds of people in her community. The world has been a worse place without Debra Abeln in it during the 23 years since the defendant killed her. Simple justice alone—just punishment—demands that the defendant serve his full term.  Furthermore, releasing the defendant would undermine respect for the law and would also sabotage the public's interest in incapacitation and deterrence.

### III. CONCLUSION

The defendant is not entitled to compassionate release and this Court should deny his motion.

**Respectfully submitted,**

**THE UNITED STATES OF AMERICA**
**STEVEN D. WEINHOEFT**
**United States Attorney**

s/ Thomas E. Leggans
**THOMAS E. LEGGANS-AUSA**
**Office of the United States Attorney**
**402 West Main Street – Suite 2A**
**Benton, Illinois 62821**
**(618) 439-3808**

20